# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-01976-SCT


*CHARLISIA MOORE, A MINOR,*

*BY AND THROUGH CHARLES MOORE*

*AND DAISY MOORE, HER NATURAL*

*PARENTS, GUARDIANS AND NEXT FRIENDS, CHARLES MOORE, INDIVIDUALLY,*

*AND DAISY MOORE, INDIVIDUALLY*
*v.*
*MEMORIAL HOSPITAL OF GULFPORT*

*AND WINN-DIXIE LOUISIANA, INC.*


## ON MOTION FOR REHEARING


| | |
|---|---|
| DATE OF JUDGMENT: | 11/9/2000 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ANDREW W. HUTTON |
| | WYNN E. CLARK |
| | ANNE M. HULL |
| | ANNE H. PANKRATZ |
| ATTORNEYS FOR APPELLEES: | WILLIAM WYATT SIMMONS |
| | WILLIAM M. RAINEY |
| | ROLAND F. SAMSON, III |
| | MATTHEW FORTE POWERS |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |

AFFIRMED IN PART AND REVERSED AND REMANDED IN
                            PART - 09/05/2002

MOTION FOR REHEARING
FILED:

MANDATE ISSUED:              9/26/2002


   **EN BANC.**

   **WALLER, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing filed by Charlisia Moore and her parents, Daisy and Charles Moore, is denied.

¶2. The Court grants its sua sponte motion for rehearing, the prior opinion is withdrawn, and these opinions are substituted in its place.

¶3. Daisy and Charles Moore, parents of the minor child Charlisia Moore, brought this civil action against the physicians who treated Daisy during her pregnancy with Charlisia, the hospital which provided care to Daisy during her pregnancy and delivery and to Charlisia after she was delivered, and the pharmacy which dispensed certain medications to Daisy during her pregnancy. They filed this appeal from the grant of summary judgment to the hospital and to the pharmacy. We affirm the circuit court's grant of summary judgment to the pharmacy. We reverse and remand the grant of summary judgment to the hospital.

## FACTS

¶4. While pregnant with Charlisia, Daisy was under the care of Maria Moman, M. D. Daisy had a history of labile hypertension and anemia. Early in her pregnancy, as the result of the hypertension, Daisy was hospitalized at Memorial Hospital in Gulfport, Mississippi, from February 12 to February 24, 1997. During Daisy's hospitalization, Dr. Moman consulted with Joseph L. Faison, M. D., who prescribed Aldomet, 250 mg every eight hours, along with vitamins and iron. After her discharge, Daisy had her prescription for Aldomet filled by the Winn-Dixie Pharmacy in Long Beach, Mississippi.

¶5. During her pregnancy, the dosage of Aldomet was adjusted by Dr. Moman. On March 6, 1997, Dr. Moman increased the dosage to 500 mg every eight hours. On April 17, 1997, Dr. Moman increased the dosage to 500 mg six times a day.

¶6. On May 19, 1997, Dr. Faison prescribed Diovan, 80 mg once per day. A notation in her medical records dated May 2, 1997, indicates that Daisy was taking 100 mg of Diovan once a day, and on June 12, 1997, a prescription was filled for Diovan, 80 mg, once a day. On July 3, 1997, the date of Charlisia's delivery, the medical records show that Daisy was taking 80 mg of Diovan each day. The Winn-Dixie Pharmacy, owned and operated by Winn-Dixie Louisiana, Inc., filled the Diovan prescription for Daisy.

¶7. Charlisia's delivery was unremarkable, but on July 7, 1997, she became cyanotic[1] and had an episode of apnea.[2] She was admitted to Memorial Hospital with a diagnosis of apnea/rule out gastroesophageal reflux. Charlisia developed respiratory distress, went into cardiopulmonary arrest, was noted to be hyperkalemic,[3] hypoatremic[4] and hypocalcemic,[5] and was transferred to the Neonatal Intensive Care

Unit. She was later transferred to Tulane Memorial Hospital with an admitting diagnosis of acute renal failure. Discharge diagnosis was end stage renal disease, secondary to maternal treatment with angiotensin II receptor blocker for hypertension during third trimester of pregnancy.

¶8. Charlisia now has a diagnosis of end stage kidney failure and needs a kidney transplant. She was on dialysis until January, 1998. She has hypertension and is not growing at a normal rate. She cannot eat any solids because she has a hyperactive gag reflex.

¶9. The Moores allege that Diovan caused Charlisia's kidney failure and that Dr. Moman and Dr. Faison were negligent in their care of Daisy by prescribing a drug which is known to cause renal failure in exposed fetuses. The Moores allege that Memorial Hospital was negligent in its care and treatment of Daisy and Charlisia by failing to monitor adequately Charlisia after her delivery and by failing to be aware of any potential danger caused by Daisy's ingestion of the Diovan. Finally, they allege that Winn-Dixie was negligent by selling a drug which was contraindicated for pregnant women.

¶10. Winn-Dixie filed a motion for summary judgment, stating that it accurately filled the medication in accordance with valid prescriptions from her treating physicians, that, pursuant to the learned intermediary doctrine,[6] it was under no duty to advise Daisy of possible side effects of the medication or to second guess the appropriateness of the prescription, and that this was the duty of her treating physicians.

¶11. The circuit court granted Winn-Dixie's motion for summary judgment, finding that (1) actionable negligence cannot exist in the absence of a legal duty; (2) the learned intermediary doctrine has been adopted by this Court; (3) the learned intermediary doctrine has been extended to pharmacists by an overwhelming majority of states; (4) a pharmacist does not have a legal duty to question the judgment made by a prescribing physician; (5) Winn-Dixie accurately filled the prescriptions at issue; (6) alleged violations of the State Board of Pharmacy's internal regulations did not give rise to an independent cause of action for damages and the regulations did not define the legal duty of care of a pharmacist; (7) Winn-Dixie did not recommend a medication to Daisy, substitute a drug comparable to the one prescribed, or observe an excessive dosage or potency of the drug on the face of the prescription; and (8) the affidavit of the Moore's expert pharmacist did not create an issue of fact.

¶12. Memorial Hospital also filed a motion for summary judgment, claiming that the claims against it were barred by the one-year statute of limitations (Miss. Code Ann. § 11-46-11(1) and (2) (2002)), and that the Moores wholly failed to comply with the mandates of the Mississippi Tort Claim Act ("MTCA") (Miss. Code Ann. §§ 11-46-1 et seq. (2002)). It averred that (1) Memorial Hospital was a community hospital as defined in § 11-46-1, et seq.; (2) Daisy and Charlisia were treated by Memorial Hospital in February, March, May, June and July of 1997; (3) the Moore's complaint was not filed until December, 1998; (4) the Moores did not serve Memorial Hospital with a notice of claim letter as required by § 11-46-11(1), so the circuit court dismissed Memorial Hospital without prejudice in May of 1999; (5) the Moores served a notice of claim letter on Memorial Hospital in June, 1999; and (6) the Moores' first amended complaint naming Memorial Hospital as a defendant was filed in December of 1999.

¶13. The circuit court granted Memorial Hospital's motion for summary judgment, finding that Memorial Hospital was a "governmental entity" as set forth in § 11-46-11(1); and using any one of three possible dates for the accrual of the Moores' cause of action,[7] the Moores' claims against Memorial Hospital were barred by the one-year statute of limitation.

¶14. The summary judgments for Winn-Dixie and Memorial Hospital were certified as final judgments under M.R.C.P. 54(b). The Moores appeal the circuit court's grant of summary judgment to Winn-Dixie and Memorial Hospital.

## STANDARD OF REVIEW

¶15. The standard for reviewing the granting or denying of summary judgment is the same standard as is employed by a trial court under Miss. R. Civ. P. 56(c). We conduct a de novo review of orders granting or denying summary judgment and examine all the evidentiary matters before it--admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment should be entered in his favor. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant would be given the benefit of the doubt. *McCullough v. Cook*, 679 So. 2d 627, 630 (Miss. 1996).

¶16. We will not reverse the trial court's decision unless it appears that triable issues of fact remain when the facts are viewed in the light most favorable to the nonmoving party. *Robinson v. Singing River Hosp. Sys.*, 732 So. 2d 204, 207 (Miss. 1999). The summary judgment motion is the only pretrial motion which allows the Court to "go behind the pleadings" and consider evidence such as admissions, answers to interrogatories, depositions, and affidavits. *Lattimore v. City of Laurel*, 735 So. 2d 400, 402 (Miss. 1999). If this examination indicates there is no genuine issue of material fact, the moving party is entitled to a judgment as a matter of law. *Id*. (citing *Newell v. Hinton*, 556 So. 2d 1037, 1041-42 (Miss.1990)).

¶17. While the motion for summary judgment is designed to expose "sham" claims and defenses, it should not be used to circumvent a trial on the merits where there are genuine issues of material fact. M.R.C.P. 56 cmt.; *Lattimore*, 735 So. 2d at 401. The party opposing the motion must be diligent and may not rest upon allegations or denials in the pleadings but must by allegations or denials set forth specific facts showing that there are indeed genuine issues for trial. *Richmond v. Benchmark Constr. Corp.*, 692 So. 2d 60, 61 (Miss. 1997). In other words, "when a motion for summary judgment is filed, the nonmoving party 'must rebut by producing significant probative evidence showing that there are indeed genuine issues for trial.'" *Foster v. Noel*, 715 So. 2d 174, 180 (Miss. 1998).

## DISCUSSION

### I. WHETHER GRANT OF SUMMARY JUDGMENT TO WINN-DIXIE WAS APPROPRIATE.

¶18. The Moores claim that the circuit court's characterization of a pharmacist's scope of duty (that a pharmacist must only provide the right drug in the correct dosage) was so narrow that it did not permit consideration of whether the pharmacist's conduct was reasonable under circumstances where certain information which contraindicated the dispensation of the medication was known or reasonably should have been known by the pharmacist. They claim that Winn-Dixie knew or should have known, that Daisy was pregnant and that Diovan should not have been dispensed to a pregnant woman and that it should have taken steps to insure that an improper combination of medications did not result from Daisy's various prescriptions.

¶19. We affirm the circuit court's findings and extend the learned intermediary doctrine to pharmacists. As one court has stated, "the cornerstone of the learned intermediary doctrine is the ability of the physician to intervene between the drug and the patient, and to make an informed decision as to the course of treatment based on the physician's knowledge of the drug as well as the propensities of the patient." *Cather*, 753 F. Supp. at 639. The physician is best situated to know the propensities of a drug and to know the needs and characteristics of his patient.

¶20. In a case similar to the one at bar, the United States District Court for the Eastern District of Pennsylvania found that parents of a child who was born with deformities as the result of a medication taken by its mother during pregnancy did not have a cause of action against the pharmacist who dispensed the drug because, under the learned intermediary doctrine, the pharmacist had no legal duty to warn the mother of hazards associated with taking a certain medication during pregnancy. *Ramirez v. Richardson-Merrell, Inc.*, 628 F. Supp. 85, 87-88 (E.D. Pa. 1986). The court reasoned:

> Under Pennsylvania law, where the drug in issue is available only by prescription, the warning required is not to the general public or to the patient, but to the prescribing physician. The manufacturer of the drug satisfies any duty it has by providing proper warnings to the prescribing physicians. It would be illogical and unreasonable to impose a greater duty on the pharmacist or druggist who properly fills the prescription than is imposed on the manufacturer. To impose a duty to warn on the pharmacist would be to place the pharmacist between the physician, who having prescribed the drug presumably knows the patient's present condition as well as his or her complete medical history, and the patient. Such interference in the patient-physician relationship can only do more harm than good. The point that must be emphasized is that the drug sold by defendant Queen Pharmacy was a prescription drug. The weighing of benefits of medication against potential dangers that are associated with it, which is the basis of the prescription drug system, requires an individualized medical judgment which only the physician can provide.

*Id.* at 87-88. *See also* *Coyle v. Richardson-Merrell, Inc.*, 584 A.2d 1383, 1385-86 (Pa. 1991) (The physician has the duty to be fully aware of (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. The physician also has the duty to advise the patient of any dangers or side effects associated with the use of the drug.).

¶21. Other courts have held that the learned intermediary doctrine should be extended to pharmacists and that pharmacists owe no legal duty to warn in the context of prescription medication: *See* *Mazur v. Merck & Co.*, 964 F.2d 1348, 1356 (3d Cir. 1992) (applying Pennsylvania law) (The physician has superior knowledge and is required to balance the risks of the drug against its utility in light of the patient's medical history); *Johnson v. Walgreen Co.*, 675 So. 2d 1036, 1037 (Fla. Dist. Ct. App. 1996) (affirming dismissal of complaint on the grounds that a Florida pharmacist's sole duty is to accurately and properly fill all lawful prescriptions presented); *Walker v. Jack Eckerd Corp.*, 434 S.E.2d 63, 67 (Ga. 1993) (Pharmacist has no duty to warn customer or notify physician that drug is being prescribed in dangerous amounts, that customer is being overmedicated, or that various drugs in their prescribed quantities could cause adverse reactions to customer.); *Fakhouri v. K Mart Corp.*, 618 N.E.2d 518, 521 (Ill. App. Ct. 1993) (Only the patient's physician can provided the individualized medical judgment to determine which medication should be utilized in any given case.); *Nichols v. Central Merch., Inc.*, 817 P.2d 1131, 1133 (Kan. Ct. App. 1991) (Under learned intermediary doctrine adopted by Kansas courts, pharmacy and its

pharmacist owed no duty to warn customer of potential side effects of drug prescribed by pregnant patient's treating physician.); *Kinney v. Hutchinson*, 449 So. 2d 696, 698 (La. Ct. App. 1984) (A pharmacist has no duty to warn of adverse effects and that duty is placed on the prescribing physician as the "informed intermediary between the manufacturer and the patient."); *Adkins v. Long*, 425 N.W.2d 151, 152 (Mich. Ct. App. 1988) (A pharmacist owes no duty to warn customer of potential side effects of substance dispensed in accordance with valid prescription or to monitor and intervene with customer's use of medication prescribed by licensed treating physician.); *Ferguson v. Williams*, 399 S.E.2d 389, 393 (N.C. Ct. App. 1991) (Pharmacist who properly fills prescription as written by physician is under no duty to warn customer about potential risks or dangers associated with taking medication.); *Griffith v. Blatt*, 973 P. 2d 385, 390 (Or. Ct. App. 1999) (Learned intermediary doctrine extended to pharmacists); *Morgan v. Wal-Mart Stores, Inc.*, 30 S.W.3d 455, 469 (Tex. Ct. App. 2000) (Pharmacists are not legally obligated to warn patients of potential adverse reactions or dangerous side effects); *McKee v. American Home Prods. Corp.*, 782 P.2d 1045, 1050 (Wash. 1989) (Only the physician can relate the propensities of the drug to the idiosyncrasies of the patient).

¶22. An exception to the learned intermediary doctrine, as applied to pharmacists, exists where it was undisputed that a plaintiff had informed the pharmacy of health problems which contraindicated the use of the drug in question. *Happel v. Wal-Mart Stores, Inc.*, 737 N.E.2d 650 (Ill. App. Ct. 2000); *Hand v. Krakowski*, 453 N.Y.S.2d 121 (N.Y. App. Div. 1982). In the case at bar, there is absolutely no evidence that Winn-Dixie's dispensing pharmacist knew of Daisy's pregnancy when the prescription for Diovan was filled.

¶23. Another exception exists where pharmacists fill prescriptions in quantities inconsistent with the recommended dosage guidelines. *Lasley v. Shrake's Country Club Pharmacy, Inc.*, 880 P.2d 1129 (Ariz. Ct. App. 1994); *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514 (Ind. 1994); *Horner v. Spalitto*, 1 S.W.3d 519 (Mo. Ct. App. 1999); *Riff v. Morgan Pharmacy*, 508 A.2d 1247 (Pa. Super. Ct. 1986); *Dooley v. Everett*, 805 S.W.2d 380 (Tenn. Ct. App. 1991). Here, however, it is undisputed that the dosage prescribed for the Diovan was not excessive and that Winn-Dixie properly filled the prescription.

¶24. The Moores claim that summary judgment for Winn-Dixie was inappropriate because it violated the State Board of Pharmacy's internal regulations. The State Board of Pharmacy is an administrative agency which governs the conduct of pharmacies within the State. *See* Miss. Code Ann. §§ 73-21-71 to -123 (2000 & Supp. 2002). A violation of one of its internal regulations, which may serve as evidence of negligence, does not, however, create a separate cause of action. The regulations do not establish a legal duty of care to be applied in a civil action. *See Morgan*, 30 S.W.2d at 466-67 (no private right of action or independent duty of care was created by State Pharmacy Act and regulations). *See also Johnson v. Walgreen Co.*, 675 So. 2d 1036 (Fla. Dist. Ct. App. 1996).

¶25. We therefore extend the learned intermediary doctrine to pharmacists and affirm the grant of summary judgment to Winn-Dixie.

## II. WHETHER GRANT OF SUMMARY JUDGMENT TO MEMORIAL HOSPITAL WAS APPROPRIATE.

¶26. The circuit court granted summary judgment to Memorial Hospital on the basis that the Moores failed to file their complaint against Memorial Hospital within the MTCA's one - year statute of limitations. The

Moores do not dispute that the MTCA applies to civil actions brought against Memorial Hospital.

¶27. The pertinent dates are as follows:

| | |
|---|---|
| 7/8/97 | Charlisia is discharged from Memorial Hospital and transferred to Tulane. |
| 8/16/97 | The attending pediatric nephrologist at Tulane advised Daisy that, in his opinion, Diovan caused Charlisia's renal failure and discussed "a right to litigation" with Daisy. Daisy contacted an attorney. |
| 9/29/97 | The Moores submitted a first request for medical records from Memorial Hospital. |
| 11/12/97 | The Moores submitted a second request for medical records from Memorial Hospital. |
| 6/8/98 | After five more requests for medical records, the Moores received an abstract of the medical records from Memorial Hospital. |
| 8/31/98 | The Moores' expert informs them of their cause of action against Memorial Hospital. |
| 12/31/98 | The Moores file a complaint against Memorial Hospital, Dr. Faison, Dr. Moman and Winn-Dixie. |
| 5/20/99 | Memorial Hospital is dismissed on the basis that the Moores failed to provide a notice of claim to Memorial Hospital as required by statute. |
| 6/9/99 | Memorial Hospital receives a statutory notice of claim from the Moores. |
| 12/16/99 | The Moores filed their First Amended Complaint, naming Memorial Hospital as a defendant. |

### A. Failure to Send a Timely Notice of Claim

¶28. Memorial Hospital contends that summary judgment is appropriate because the Moores failed to send a timely notice of claim. If the Moores' cause of action against Memorial Hospital accrued on August 31, 1998, the notice of claim should have been sent prior to August 31, 1999. The Moores sent the notice of claim on June 9, 1999. If the cause of action accrued on August 31, 1998, it was therefore timely sent.

### B. Failure to File Timely the Complaint after Voluntary Dismissal

¶29. Memorial Hospital argues that, even if the notice of claim was timely filed, the Moores' claims against it are barred by the one-year statute of limitations. If the Moores' cause of action against Memorial Hospital accrued on August 31, 1998, under the MTCA one-year statute of limitations, they had until August 31, 1999, to file their complaint against Memorial Hospital. The first complaint was filed on December 31, 1998, but then the complaint was voluntarily dismissed against Memorial Hospital on May 20, 1999. Memorial Hospital received a statutory notice of claim from the Moores on June 9, 1999. Under § 11-46-11(3),[8] the one-year statute of limitations is tolled for 120 days after the filing of the notice of claim. Therefore, if the cause of action accrued on August 31, 1998, the amended complaint which was filed on December 16, 1999, was timely.

### C. The Discovery Rule

¶30. The Moores claim that the one-year statute of limitations[9] did not begin to run until August 31, 1998, when their expert informed them of their cause of action against Memorial Hospital. They assert that they

were diligent in seeking an expert opinion, but that the delay in acquiring the medical records from Memorial Hospital prevented the "discovery" of their cause of action against Memorial Hospital within the year immediately subsequent to Charlisia's birth and the Moores' learning that Diovan caused Charlisia's renal failure.

¶31. We have held that the discovery rule applies to the MTCA's statute of limitations. *Barnes v. Singing River Hosp. Sys.*, 733 So. 2d 199, 204 (Miss. 1999). The discovery rule provides a tolling of the running of a statute of limitations until a plaintiff "should have reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent." *Sarris v. Smith*, 782 So. 2d 721, 725 (Miss. 2001). Expressed another way, "the operative time [for the running of the statute of limitations] is when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner." *Smith v. Sanders*, 485 So. 2d 1051, 1052 (Miss. 1986) (quoted with approval in *Sarris*, 782 So. 2d at 723).

¶32. The circuit court held that the Moores' complaint was untimely filed because it calculated the time in which to file the complaint by using the old 95-day period for filing a notice of claim instead of the amendment's 120-day period. It appears from the record that Daisy should have known of her claim against Memorial Hospital on August 16, 1997, when Charlisia's attending physician at Tulane informed her of her right to litigation and when, on the very same day, Daisy consulted an attorney. However, the circuit court should decide this issue after the parties have had the opportunity to submit evidence and are afforded an opportunity to fully present their arguments.

## CONCLUSION

¶33. We affirm the Circuit Court of Harrison County's grant of summary judgment to Winn-Dixie Louisiana, Inc. We reverse the circuit court's grant of summary judgment to Memorial Hospital and remand for further proceedings consistent with this opinion.

¶34. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PITTMAN, C.J., SMITH, P.J., COBB, EASLEY, CARLSON, AND GRAVES, JJ., CONCUR. McRAE, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.**

**McRAE, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶35. While I agree with this Court's decision on the motion for rehearing to affirm the grant of summary judgment to Winn-Dixie, I disagree with that portion of the majority opinion which extends the learned intermediary doctrine to pharmacists and grants them immunity if a doctor prescribes a drug for a patient.

¶36. We have never extended the learned intermediary doctrine between two professionals, and we should not start now. The doctrine is intended to relieve a manufacturer of the duty to notify consumers and to protect it from liability when there is an intervening expert, i.e. a pharmacist or a doctor. *Wyeth Labs., Inc. v. Fortenberry*, 530 So.2d 688 (Miss. 1988). In those situations, the duty is on the intervening professional. The same should not apply between a doctor and a pharmacist. Pharmacists have superior knowledge and training in pharmacology and that expertise and the duties that accompany it should be recognized and not imputed to doctors. It is true that a doctor is best situated to know the medical needs of

his or her patient(s), but the reactions and interactions of drugs are best left to other experts.

¶37. Pharmacists do not simply count pills. They are the experts in pharmacology, unlike doctors who only know perhaps a handful of drugs. Pharmacists go to school for many years to learn about drugs and their reactions to other drugs; doctors' exposure is not nearly as in depth or intense as they take only one or two courses. The pharmacist is trained to know how different drugs should be used to treat patients, and how they affect the human body and react with each other. A doctor's basic knowledge of drugs comes from pharmaceutical representatives. A doctor usually checks with the friendly pharmacist about drugs and their reactions. Suits against pharmaceutical companies primarily will necessitate the bringing in of the doctor and not the pharmacist. This is wrong. Miss. Code Ann. § 73-21-73(aa) (2000) states that the "'[p]ractice of pharmacy' shall mean a health care service that includes, but is not limited to . . . interpreting and evaluating prescriptions . . . [and] **advising and consulting** concerning therapeutic values, content, hazards and uses of drugs and devices . . . ." (emphasis added). To hold that a pharmacist is shielded by the learned intermediary doctrine goes against this statutory provision.

¶38. Although pharmacists, like other professionals, should be given some degree of autonomy in order to work effectively, they should not be given immunity under the learned intermediary doctrine. Besides giving them no responsibility for the very services for which they are trained and expected to provide, this blanket immunity for pharmacists opens the door for litigation involving others in the medical profession, namely doctors. In efforts to compensate litigants in circumstances where error has occurred, doctors and other healthcare professionals will be brought into court and unjustly subjected to lawsuits. For these reasons, the learned intermediary doctrine should not be extended to pharmacists.

¶39. I agree with the results reached in this case. However, in order to prevent this injustice to others in the medical community, the learned intermediary doctrine should **not** be applied to pharmacists.

**DIAZ, J., JOINS THIS OPINION.**

1. A discoloration of the skin due to lack of oxygen in the blood.

2. Absence of breathing.

3. Too much potassium in the blood.

4. A shortage of salt in the blood.

5. A shortage of calcium in the blood.

6. The "learned intermediary doctrine," adopted by this Court in *Wyeth Labs., Inc. v. Fortenberry*, 530 So. 2d 688 (Miss. 1988), holds that pharmaceutical companies are required to warn only the prescribing physician of dangers inherent in its products because the prescribing physician acts as a "learned intermediary" between the manufacturer and the consumer. *Id.* at 691. This doctrine has been extended to insulate from liability the manufacturers of medical devices available through physicians. *Cather v. Catheter Tech. Corp.*, 753 F. Supp. 634 (S.D. Miss. 1991).

7. The three possible dates on which the Moores' claims against Memorial Hospital might have accrued are as follows: (1) July 8, 1997 - the date Charlisia was discharged from Memorial Hospital and transferred to Tulane Medical Center; (2) August 16, 1997 - the date Charlisia was diagnosed with renal failure, a

nephrologist advised Daisy that Diovan had caused the renal failure, and Daisy contacted an attorney; and (3) August 31, 1998 - the date the Moores' expert witness informed them of their alleged cause of action against Memorial Hospital.

8. On March 25, 1999, our Legislature extended the period of time a notice of claim tolled the statute of limitations for actions brought against governmental entities under the MTCA. In *Hollingsworth ex rel. McDonald v. City of Laurel*, 808 So. 2d 950 (Miss. 2002), we held that "where an amended statute remedially lengthens a statute of limitations, [this Court] will apply the amendment to existing causes." *See also Roberts v. New Albany Separate Sch. Dist.*, 813 So. 2d 729, 731 (Miss. 2002). Therefore, plaintiffs such as the Moores will receive the benefit of the longer limitations period.

9. Miss. Code Ann. § 11-46-11(3) provides in relevant part as follows:

> (3) All actions brought under the provisions of this chapter shall be commenced within one (1) year next after the date of the tortious, wrongful or otherwise actionable conduct on which the liability phase of the action is based, and not after; provided, however, that the filing of a notice of claim as required by subsection (1) of this section shall serve to toll the statute of limitations for a period of ninety-five (95) days from the date the chief executive officer of the state agency receives the notice of claim, or for one hundred twenty (120) days from the date the chief executive officer or other statutorily designated official of a municipality, county or other political subdivision receives the notice of claim, during which time no action may be maintained by the claimant unless the claimant has received a notice of denial of claim. After the tolling period has expired, the claimant shall then have an additional ninety (90) days to file any action against the governmental entity served with proper claim notice. However, should the governmental entity deny any such claim, then the additional ninety (90) days during which the claimant may file an action shall begin to run upon the claimant's receipt of notice of denial of claim from the governmental entity. All notices of denial of claim shall be served by governmental entities upon claimants by certified mail, return receipt requested, only. For purposes of determining the running of limitations periods under this chapter, service of any notice of claim or notice of denial of claim shall be effective upon delivery by the methods statutorily designated in this chapter. The limitations period provided herein shall control and shall be exclusive in all actions subject to and brought under the provisions of this chapter, notwithstanding the nature of the claim, the label or other characterization the claimant may use to describe it, or the provisions of any other statute of limitations which would otherwise govern the type of claim or legal theory if it were not subject to or brought under the provisions of this chapter.